NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SHANDEL DOUGLAS,<br><br>Plaintiff,<br><br>v.<br><br>CENTER FOR COMPREHENSIVE CARE/JERSEY CITY MEDICAL CENTER, RWJ BARNABAS HEALTH INC., DR. ADRIANA GRIGORIU, JOHN DOES 1-10,<br><br>Defendants. | Case No. 16-9146 (SDW) (LDW)<br><br>**OPINION**<br><br>March 26, 2019 |

**WIGENTON**, District Judge.

Before this Court is Defendants Jersey City Medical Center ("JCMC"), RWJBarnabas Health, Inc. ("Barnabas"), and Dr. Adriana Grigoriu's ("Dr. Grigoriu") (collectively, "Defendants") Motion for Summary Judgment brought pursuant to Federal Rule of Civil Procedure 56. This Court has jurisdiction over this action pursuant to 28 U.S.C §§ 1331 and 1367. Venue is proper pursuant to 28 U.S.C. § 1391. This motion is decided without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons discussed below, Defendants' Motion for Summary Judgment is **GRANTED in part and DENIED in part**.

I.  **BACKGROUND AND PROCEDURAL HISTORY**

Plaintiff Shandel Douglas ("Plaintiff") is a black registered nurse who began working for JCMC in September 2014, first in Medical and Social Services for the Homeless ("MASSH") and then in the Center for Comprehensive Care ("CCC"). (Defs.' Statement of Material Facts ("SMF")

¶¶ 1-2, 7, ECF No. 43-1; *see also* Grigoriu Dep. 38:20-23, ECF No. 43.)  The following events precipitated Plaintiff's termination from the CCC and the instant suit.

A. <u>Work-Place Grievances</u>

Between July and October of 2015, Plaintiff lodged multiple complaints against her co-workers Eileen Scarinci ("Eileen") and Eileen's daughter, Regina Scarinci ("Regina"), who are white.  (Santagata Cert. Exs. L-M, O-Q, ECF No. 53; *see also* Whyatt Aff. ¶ 9, ECF No. 52-3.)  On July 15, 2015, Plaintiff e-mailed the Vice President of Human Resources Mary Cataudella ("Cataudella"), relaying that Eileen had spoken to Plaintiff in a "condensing [sic] and belittling tone[.]"  (Santagata Cert. Ex. L; *see also* Cataudella Dep. 7:10, ECF No. 43.)  She also stated that "the environment . . . with Regina . . . and her mother . . . are not good with the staff [sic]."  (*Id.*)  On July 24, 2015, Plaintiff referenced another incident with Eileen, stating that she was "making [the] work environment . . . very difficult and uncomfortable" and that her "behavior continues to be unprofessional and intimidating."  (Santagata Cert. Ex. M.)  In a letter dated August 10, 2015, Plaintiff stated that Eileen had barged in on Plaintiff while she was with a patient.  (Santagata Cert. Ex. O.)  On September 17, 2015, Plaintiff e-mailed Cataudella to say: "The behavior between Eileen . . . and . . . Regina . . . has constantly caused issues amongst the nursing staff at CCC."  (Santagata Cert. Ex. P.)  On September 18, 2015, Plaintiff informed Cataudella that Eileen and Regina were seen yelling at Lynn Stanley ("Stanley"), a nurse manager, and that "Regina . . . threw her badge at [Stanley] and told her, she can keep her job."  (Pl.'s Counter Statement of Material Facts ("CSMF") ¶ 19, ECF No. 52-1.)[1]  Regina was never disciplined for her behavior; instead, Vice President of Community Medicine Susan Walsh ("Walsh") rescinded Regina's resignation.  (Pl.'s CSMF ¶ 44; *see also* Santagata Cert. Ex. H; Cataudella Dep. 58:2-59:11.)

---

[1] Defendants dispute whether Regina "threw her badge" at Stanley as others have described Regina "turning in her badge."  (Defs.' Resp. to Pl.'s CSMF ¶¶ 22-23, ECF No. 54-2.)

Following an investigation into Plaintiff's complaints, in a letter dated October 7, 2015, Cataudella advised Plaintiff that she "was able to substantiate some of the claims of harassment" and that she had taken appropriate action. (Blunda Cert. Ex. T, ECF No. 43; *see also* Blunda Cert. Ex. C, Cataudella Cert. ¶¶ 5-6, ECF No. 54-1 ("Eileen had engaged in inappropriate behaviors towards [Plaintiff,] . . . includ[ing] barging into a room where [Plaintiff] was with a patient, yelling at [Plaintiff] or insulting her in front of others, and accusing [Plaintiff] of treating . . . Regina . . . unfairly.").) Eileen was permitted to resign in lieu of termination. (Cataudella Dep. 63:8-10, 64:17-66:8.)

Aside from her complaints about co-workers, Plaintiff also alleged that she was being subjected to "retaliation, harassment and bullying" from management, and raised concerns with human resources that there were displays of favoritism towards non-black employees. (Pl.'s CSMF ¶ 26; Santagata Cert. Exs. L, R, T; *see also* Pl.'s Dep. 84:23-87:9, ECF No. 43.) For example, in her July 15, 2015 e-mail to Cataudella, Plaintiff stated that she had spoken to Program Manager Whitney Bracco ("Bracco") about an issue she was having with Eileen. (*See* Santagata Cert. Ex. L.) However, upon raising the issue with Bracco, Plaintiff was met with criticisms and countercomplaints involving Regina. (*Id*.) Plaintiff expressed to Cataudella that "mentioning [Regina] in the matter, displays favoritism because of her mother's status and relationship with Dr. Grigoriu." (*Id.*)[2] On October 1, 2015, Plaintiff stated that she felt "harassed by management and retaliated against" after Dr. Grigoriu and Stanley issued a verbal warning regarding Plaintiff's

---

[2] Kim Whyatt ("Whyatt"), who was formerly MASSH's office manager, avers that Dr. Grigoriu and Eileen were close friends, and that at Eileen's request, Dr. Grigoriu "successfully pushed" to hire Regina. (Whyatt Aff. ¶¶ 1-2, 9-10.) Whyatt also asserts that at one time, the manager of MASSH wanted to fire Regina because she "gave a patient the wrong shot[,]" but that Dr. Grigoriu fought against termination and "Regina was not disciplined at all." (*Id.* ¶ 12; *see also* Cataudella Dep. 79:21-81:6 (testifying that Regina was never disciplined for administering the wrong vaccine).)

3

work performance.³ (Santagata Cert. Ex. R.) That same day, Plaintiff also filed a grievance because her request to change her schedule was "approved on a provisional basis according to clinic needs[,]" whereas two other employees were permitted to change their schedules without any conditions. (Santagata Cert. Ex. T.)

B. The Vaccination Incident

As part of her job duties, Plaintiff would administer and document vaccinations. (*See* Pl.'s Dep. 72:2-9.) On October 29, 2015, a CCC patient known as "JS" requested pneumovax and Hepatitis B vaccines, which her doctor had ordered for her on October 20, 2015. (Defs.' SMF ¶¶ 23, 25.) The nursing staff advised JS that she had already been given the Hepatitis vaccination, which the patient disputed. (*Id.* ¶¶ 23-24.) Upon review, Dr. Grigoriu noted that JS's vaccination log had "an entry for 10/20/15 with Hepatitis B vaccine 40 micrograms administered in 2 deltoid sites and signed by [Plaintiff.]" (*Id.* ¶¶ 27-28.) However, there were no corresponding entries in the inventory log book or the patient's medical chart to indicate the vaccine had been administered.⁴ (*Id.* ¶¶ 40-41, 43.) Additionally, "[t]he lot number was different from the lot number of the current vaccine supply." (*Id.* ¶¶ 32-33.) Dr. Grigoriu spoke to Plaintiff about the discrepancy that same day.⁵ (*See* Defs.' SMF ¶ 46.) The incident was reported to the chief nursing officer and an investigation followed. (*Id.* ¶ 53.)

---

³ Plaintiff's supervisors referenced Standards for Employee Behavior in the Workplace, such as taking initiative and being polite to fellow employees. (Santagata Cert. Ex. R.) Plaintiff stated: "The example used by [Stanley] was that she has seen me not smile or initiate saying good morning to Dr. Grigoriu and . . . Bracco." (*Id.*)
⁴ Injections were to be documented in three places: (1) the vaccination log in a patient's chart; (2) the log book located behind the nursing desk; and (3) on the vital sign sheet for the patient. (*Id.* ¶ 22.) The vaccines' lot numbers, expiration dates, and the total number of vials remaining are documented in the log book. (*Id.* ¶¶ 36-37.)
⁵ The parties dispute whether Plaintiff provided a detailed recollection of administering the vaccine to JS, or if she was briefly shown a chart with her signature before replying: "Well, if I signed for it that I gave her the injection, than [sic] I gave it. I wouldn't sign for something that I did not give[.]" (*Compare* Defs.' SMF ¶¶ 52, 58 *with* Pl.'s Dep. 77:5-7, 89:8-14.)

4

C. Suspension & Termination

On October 29, 2015, Plaintiff and her union delegate met with Cataudella to discuss Plaintiff's continued allegations of retaliation and harassment. (Pl.'s CSMF ¶ 30; Defs.' SMF ¶ 55.) During the meeting, Cataudella also addressed the vaccination incident before suspending Plaintiff pending further investigation. (Defs.' SMF ¶¶ 56, 59-60.)

In mid-November 2015, Plaintiff had a follow-up meeting with Cataudella. (*Id.* ¶ 71.) Plaintiff was shown security footage which showed that she and JS had never interacted on the date in question. (*Id.* ¶ 75.) Plaintiff was terminated on November 24, 2015. (*Id.* ¶ 77.) Pursuant to a Corrective Action Form, Plaintiff was advised:

> You are hereby issued a termination notice as a result of the investigation regarding your actions related to paitent [sic] JS.
> You violated Nursing Practice, documentation and patient safety protocols and policy and provided misleading information during the investigation.
> You also failed to abide by Human Resources Policy Rules of Behavior and the Hospital's Universal Behavioral Standards.

(Blunda Cert. Ex. J.)

D. Post-Termination

In January 2016, Plaintiff filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") and the New Jersey Division on Civil Rights, alleging discrimination based on race and retaliation in violation of Title VII of the Civil Rights Act of 1964. (Blunda Cert. Ex. C.) In reference to her termination, she stated that "non-Black individuals have committed same [sic] or similar or even worse infractions yet were not subject to as harsh a disciplinary action and/or termination." (*Id.*) She also alleged that prior to her termination, she was "subjected to harassment and a hostile work environment from Eileen[.]" (*Id.*) The EEOC issued a right to sue letter on October 20, 2016. (Blunda Cert. Ex. D.)

5

Plaintiff initiated the instant suit against Defendants on December 12, 2016. (ECF No. 1.) On December 14, 2017, Plaintiff filed a four-count Amended Complaint, alleging claims against Defendants CCC/JCMC and Barnabas for racial discrimination (Count One), unlawful retaliation (Count Two), and hostile work environment (Count Three) in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the New Jersey Law Against Discrimination ("NJLAD"). (ECF No. 32.) She also brought a claim against Dr. Grigoriu for aiding and abetting violations of the NJLAD (Count Four). (*Id.*) On October 26, 2018, Defendants filed the instant Motion for Summary Judgment. (ECF No. 43.) Plaintiff opposed on December 3, 2018, and Defendants replied on December 10, 2018. (ECF Nos. 52-54.)

## II. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law." *Id.* at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The dispute is not genuine if it merely involves "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once the moving party

meets its initial burden, the burden then shifts to the nonmovant who must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations, speculations, unsupported assertions or denials of its pleadings. *Shields v. Zuccarini*, 254 F.3d 476, 481 (3d Cir. 2001). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

The nonmoving party "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex Corp.*, 477 U.S. at 325). Further, the nonmoving party is required to "point to concrete evidence in the record which supports each essential element of its case." *Black Car Assistance Corp. v. New Jersey*, 351 F. Supp. 2d 284, 286 (D.N.J. 2004). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which . . . [it has] the burden of proof[,]" then the moving party is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 322-23. Furthermore, in deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. The nonmoving party cannot defeat summary judgment simply by asserting that certain evidence submitted by the moving party is not credible. *S.E.C. v. Antar*, 44 F. App'x 548, 554 (3d Cir. 2002).

### III. DISCUSSION

#### A. Exhaustion of Administrative Remedies

Prior to initiating a Title VII action, a plaintiff must exhaust her administrative remedies by filing a charge with the EEOC and receiving a right to sue letter. *Devine v. St. Luke's Hosp.*,

406 F. App'x 654, 656 (3d Cir. 2011) (citing 42 U.S.C. § 2000e-5(e)(1)). The failure to exhaust administrative remedies is not a jurisdictional defect. *Id.* (citing *Anjelino v. N.Y. Times Co.,* 200 F.3d 73, 87-88 (3d Cir. 1999)). It is an affirmative defense that the defendants bear the burden of pleading and proving. *Williams v. Runyon*, 130 F.3d 568, 573 (3d Cir. 1997) (citations omitted).

Here, Defendants argue for the first time in their motion for summary judgment that Plaintiff has failed to exhaust her administrative remedies against Defendant Barnabas because her EEOC charge was only filed against "Center for Comprehensive Care/Jersey City Medical Center[.]" (*See* Blunda Cert. Ex. C.) However, Barnabas has waived this affirmative defense because it was never raised in its Amended Answer. (*See generally Am. Answer*, ECF No. 34); *see also Barzanty v. Verizon PA, Inc.*, 361 F. App'x 411, 415-16 (3d Cir. 2010) ("A party waives a defense only if it fails to raise it by motion *and* does not include it in a responsive pleading." (citing Fed. R. Civ. P. 12(h)).[6] Thus, this Court will proceed in analyzing the merits of Plaintiff's claims.

B. <u>Racial Discrimination Claims (Count One)</u>

Under Title VII and the NJLAD, employers are prohibited from discharging or otherwise discriminating against individuals with respect to compensation, terms, conditions, or privileges of employment, based on race. 42 U.S.C. § 2000e-2(a); N.J. Stat. Ann. § 10:5-12(a). A plaintiff who has circumstantial or direct evidence of racial discrimination can bring a claim under either the "pretext theory" set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) or the

---

[6] Even if Barnabas had asserted such an affirmative defense in its responsive pleadings, the Third Circuit has recognized a narrow exception to the exhaustion requirement "when the unnamed party received notice and when there is a shared commonality of interest with the named party." *Kuilan v. Sodexo Inc.*, No. 11-4567, 2012 WL 1964492, at *5 (D.N.J. May 31, 2012) (quoting *Schafer v. Bd. of Pub. Educ.*, 903 F.2d 243, 252 (3d Cir. 1990)). This Court notes that Plaintiff's EEOC charge was addressed to Cataudella who is employed by "JCMC, Robert Wood Johnson, Barnabas Health." (Cataudella Dep. 7:6-10.) Dr. Grigoriu has similarly testified that she is an employee of JCMC, Robert Wood Johnson, Barnabas Health. (Grigoriu Dep. 6:3-6, ECF No. 43.) Thus, it appears that there is a shared commonality of interest between Barnabas and a named party such that Plaintiff's Title VII claims against Barnabas need not be dismissed at this stage.

8

"mixed-motive theory" set forth in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016); *see also Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008) (explaining that after *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003), plaintiffs electing to proceed under the mixed-motive theory could rely on either direct or circumstantial evidence of discrimination); *Byrd v. Lynch*, No. 10-0247, 2011 WL 2680572, at *4 (D.N.J. July 8, 2011) (explaining that Title VII and NJLAD claims are analyzed under the same evidentiary frameworks).

In a "pretext" case, the plaintiff must show that her protected status was a "determinative factor" in the defendant's adverse employment decision whereas in a "mixed-motive" case the plaintiff must show her status was a "motivating factor." *Connelly*, 809 F.3d at 788 (differentiating the theories based on the degree of causation that must be shown). The "mixed-motive" and "pretext" labels can be misleading, and courts have explained that "in a non-*Price Waterhouse* case, a plaintiff need not necessarily show 'pretext' but may prevail simply by showing, through direct or circumstantial evidence, that the challenged action resulted from discrimination." *Watson v. Se. Pa. Transp. Auth.*, 207 F.3d 207, 214 n.5 (3d Cir. 2000).

   *i. McDonnell Douglas Framework*

Under the *McDonnell Douglas* three-part, burden-shifting framework, the plaintiff bears the initial burden of establishing that: (1) she is a member of a protected class; (2) she was otherwise qualified for the position; (3) she has suffered an adverse employment action; and (4) the adverse action occurred under circumstances that give rise to an inference of discrimination. *See Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410-11 (3d Cir. 1999). At the second step, the burden "shift[s] to the employer to articulate some legitimate, nondiscriminatory reason" for its employment action. *McDonnell Douglas*, 411 U.S. at 802. If the employer satisfies this burden, at the third step, the burden shifts back to the plaintiff to show that the employer's purported reason

for the adverse employment action was "in actuality a pretext for intentional race discrimination." *Jones*, 198 F.3d at 412.

Here, Plaintiff has set forth sufficient facts to satisfy part one under *McDonnell Douglas*.[7] The first three elements of Plaintiff's *prima facie* case are met because she is a black registered nurse who was terminated from her employment. (Pl.'s Resp. to Defs.' SMF ¶¶ 1, 77, ECF. No. 52-1.) The fourth element is met because Plaintiff has delineated the ways in which she was treated less favorably than similarly-situated employees who are not in her protected class. *See Golod v. Bank of Am. Corp.*, 403 F. App'x 699, 702 n.2 (3d Cir. 2010) (explaining that an inference of discrimination "could be supported in a number of ways, including, but not limited to, comparator evidence, evidence of similar racial discrimination of other employees, or direct evidence of discrimination from statements or actions by her supervisors suggesting racial animus"). Unlike Plaintiff, who was fired following the vaccination incident with JS, Regina was never disciplined after she administered the wrong vaccine to a patient.[8] (Cataudella Dep. 79:21-81:6; *see also* Whyatt Aff. ¶ 12.) Also, whereas Plaintiff was immediately terminated following an investigation into the vaccination incident, Eileen was permitted to resign following an investigation into her conduct. (Cataudella Dep. 63:8-10.)

At step two, Defendants have produced evidence that Plaintiff was terminated for legitimate, nondiscriminatory reasons, namely that she violated nursing practices and patient safety

---

[7] Defendants do not substantively dispute that Plaintiff can establish her *prima facie* case. (Defs.' Moving Br. at 22-23, ECF No. 43.)

[8] Though Defendants argue that Plaintiff's offense is not comparable to Regina's, (Defs.' Reply Br. at 10-11, ECF No. 54), this Court notes that a "similarly situated employee does not need to be identically situated." *Abdul-Latif v. Cty. of Lancaster*, 990 F. Supp. 2d 517, 525-26 (E.D. Pa. 2014). Additionally, "[w]hether comparators are similarly situated is generally a question of fact for the jury." *Id.* at 526. As discussed above, the parties dispute whether Plaintiff provided false information during Defendants' investigation into JS's vaccination. *See supra* note 5. This Court will not make credibility determinations on a motion for summary judgment.

protocols when she provided false information during the investigation into the vaccination incident. (Defs.' Moving Br. at 24; Defs.' SMF ¶¶ 77-81.)

At step three, "the plaintiff must 'either (i) discredit[] the proffered reasons, either circumstantially or directly, or (ii) adduc[e] evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.'" *Wells v. Retinovitreous Assocs., Ltd.*, 702 F. App'x 33, 36 (3d Cir. 2017) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)). Here, Plaintiff points to statements that suggest Defendants were planning to fire her before the vaccination incident. Specifically, after Regina was verbally reprimanded on September 17, 2015 for speaking in an inappropriate manner to a co-worker, Dr. Grigoriu purportedly reassured her: "just wait, she's leaving[,]" in reference to Plaintiff. (Cataudella Dep. 85:21-86:24; Santagata Cert. Ex. W; *see also* Corrective Action Form, Santagata Cert. Ex. K at D000341 ("I have been told to tolerate it because people are leaving.").) Though Defendants argue that the "she's leaving" comment referred to Plaintiff's pending transfer to a different department, Plaintiff maintains that such an interpretation is implausible because her transfer had been denied two weeks earlier on September 4, 2015. (Santagata Cert. Ex. X.) Additionally, when Regina attempted to quit after being reprimanded, Walsh rescinded Regina's resignation and said: "We can work on this. . . . We'll get to the bottom of whatever issues were taking place at the center." (Cataudella Dep. 58:15-59:17.) Plaintiff has provided evidence that would allow a factfinder to reasonably infer that Defendants' proffered non-discriminatory reason for terminating Plaintiff was pretextual. *See Andes v. N.J. City Univ.*, 419 F. App'x 230, 233 (3d Cir. 2011) (explaining that at the motion for summary judgment stage, "the plaintiff need only raise doubt as to the legitimacy of the defendant's proffered reason for its adverse action; it need not prove its discrimination case"); *see also Michaels v. Rutgers Univ. N.J. Med. Sch.*, No. 15-7603, 2019 WL 625804, at *11 (D.N.J. Feb. 14, 2019) (citing *Fuentes*, 32 F.3d

at 764). As such, this Court finds that Plaintiff has raised material issues of fact that preclude summary judgment as to Count One.

*ii. Price Waterhouse Framework*

Under the *Price Waterhouse* framework, "a plaintiff may establish that the defendant engaged in an unlawful employment practice 'by demonstrating that race . . . was a motivating factor for any employment practice, even though other factors also motivated the practice.'" *Mensah v. Cambridge Sec., SVC*, No. 12-05901, 2014 WL 197898, at *4 (D.N.J. Jan. 14, 2014) (quoting *Sosa v. Napolitano*, 318 F. App'x 68, 72 (3d Cir. 2009)); *see also* 42 U.S.C. § 2000e-2(m). If the plaintiff proves that the defendant engaged in an unlawful employment practice, the defendant then "has a limited affirmative defense that does not absolve it of liability, but restricts the [plaintiff's] remedies . . . [to] declaratory relief, certain types of injunctive relief, and attorney's fees and costs." *Desert Palace, Inc.*, 539 U.S. at 94 (citing 42 U.S.C. § 2000e-5(g)(2)(B)). Furthermore, "to avail itself of the affirmative defense, the employer must 'demonstrat[e] that [it] would have taken the same action in the absence of the impermissible motivating factor.'" *Id*. at 94-95.

Here, Plaintiff has provided circumstantial evidence that her race was an illegitimate motivating factor in her termination, even if the vaccination incident was another, legitimate factor. *See Cange v. Phila. Parking Auth.*, 451 F. App'x 210, 213 (3d Cir. 2011) ("[A] plaintiff who can present only circumstantial evidence of discrimination may proceed under the mixed-motive theory.") As discussed above, testimonial and documentary evidence suggest that Plaintiff's supervisors planned on terminating Plaintiff prior to the vaccination incident. (Cataudella Dep. 85:21-86:24; Santagata Cert. Ex. W; *see also* Corrective Action Form, Santagata Cert. Ex. K at D000341-42.) Additionally, there is evidence that a white employee, namely Regina, was not fired or otherwise disciplined after giving a patient the wrong vaccination. (Cataudella Dep. 79:21-

81:6; *see also* Whyatt Aff. ¶ 12.) Ultimately, Plaintiff has highlighted evidence that would permit a reasonable jury to find that her race was a motivating factor in her termination.

    C. <u>Retaliation (Count Two)</u>

"An employee's retaliation claims are subject to the *McDonnell Douglas* three-part burden-shifting framework[.]" *Anderson v. Boeing Co.*, 694 F. App'x 84, 88 (3d Cir. 2017). In order to establish a retaliation claim, Plaintiff must first submit evidence showing that "(1) she engaged in a protected activity under Title VII [and NJLAD]; (2) the employer took an adverse action against her; and (3) there was a causal connection between the employee's participation in the protected activity and the adverse employment action." *Hashem v. Hunterdon Cty.*, No. 15-8585, 2016 WL 5539590, at *15 (D.N.J. Sept. 29, 2016). If Plaintiff establishes a *prima facie* case of retaliation, the burden of production shifts to Defendants to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Anderson*, 694 F. App'x at 86. If Defendants' burden is met, the burden shifts back to Plaintiff to "show by a preponderance of the evidence that [Defendants'] proffered reason is pretextual." *Id.*

This Court finds that Plaintiff can establish her *prima facie* case for retaliation. Opposing discrimination made unlawful by Title VII or the NJLAD qualifies as a "protected activity." *See Moore v. Beers*, 121 F. Supp. 3d 425, 431 (D.N.J. 2015) (citing *Moore v. City of Phila.*, 461 F.3d 331, 340-41 (3d Cir. 2006)); *see also* 42 U.S.C. § 2000e-3(a); N.J. Stat. Ann. § 10:5-12(d). Here, Plaintiff has set forth evidence that she filed numerous complaints with human resources about Eileen's behavior, which was ostensibly only directed at black employees, and about management's disparate treatment of black employees. Plaintiff can establish a causal connection between her protected activity and Defendants' adverse employment actions in pertinent part through "(1) timing, and (2) a pattern of antagonism." *Dorvil v. Burlington Coat Factory Warehouse Corp.*, No. 09-5778, 2011 WL 4899976, at *5 (D.N.J. Oct. 14, 2011). Following her

complaints, Plaintiff received counter-complaints from management about her attitude and work performance. As her most conspicuous example, Plaintiff was discussing her grievances with human resources when she was asked about the vaccination incident, suspended, and subsequently terminated. The "temporal proximity between the protected activity and the termination is [itself] sufficient to establish a causal link." *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 189 (3d Cir. 2003) (quoting *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997)). Thus, Plaintiff has provided sufficient evidence to shift the burden to Defendants to articulate some legitimate, non-discriminatory reason for terminating Plaintiff.

As discussed above, Defendants have met their burden by producing evidence that Plaintiff was fired for falsely documenting a vaccination. In turn, Plaintiff has raised issues of fact to support the inference that the proffered reasons for her termination were pre-textual. A reasonable jury could conclude that Plaintiff was fired in retaliation for her protected activity, particularly considering the evidence that each time Plaintiff lodged a complaint with a supervisor, she was met with a countercomplaint or disciplinary action shortly thereafter. Therefore, Defendants' motion for summary judgment is denied as to Count Two.

### D. Hostile Work Environment (Count Three)

To establish a hostile work environment claim, Plaintiff must demonstrate that "(1) she suffered intentional discrimination because of her membership in a protected class; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected [her]; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) the existence of *respondeat superior* liability." *Hopkins v. Kuehne + Nagel Inc.*, No. 15-7454, 2018 WL 6243039, at *9 (D.N.J. Nov. 28, 2018) (citing *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013)); *see also Sgro v. Bloomberg L.P.*, 331 F. App'x 932, 941 (3d Cir. 2009) ("New Jersey courts treat hostile work environment claims under the NJLAD the same as the

14

Supreme Court treats hostile work environment actions under Title VII."). "The first four elements establish a hostile work environment, and the fifth element determines employer liability." *Mandel*, 706 F.3d at 167 (citation omitted). If the harassing employee is the Plaintiff's co-worker, "the employer is liable only if [it] was negligent in controlling working conditions." *Brown v. Joel Tanis & Sons, Inc.*, No. 13-02984, 2016 WL 3951378, at *4 (D.N.J. July 21, 2016); *see also Reynolds v. Atl. City Convention Ctr. Auth.*, No. 88-4232, 1990 WL 267417, at *16 (D.N.J. May 26, 1990), *aff'd*, 925 F.2d 419 (3d Cir. 1991) ("[W]here a plaintiff seeks to hold her employer liable for a hostile environment created by co-workers, 'she must show that the employer knew or should have known of the harassment . . . and failed to take prompt remedial action.'").

In the instant suit, Plaintiff claims that Eileen, Regina, and Dr. Grigoriu created a hostile work environment, and that her employer is liable because it negligently failed to take remedial action.[9] (Am. Compl. ¶¶ 33-36; *see also* Pl.'s Opp'n Br. at 27.) This Court is not persuaded that Eileen's alleged conduct was comprised of "innocuous . . . isolated, minor incidents" that did not have any connection to Plaintiff's race, such that it could not support a hostile work environment claim. (*See* Defs.' Moving Br. at 35.) First, this Court notes that Plaintiff's claim need not be predicated on overt, derogatory references to her race. The Third Circuit has cautioned that "the advent of more sophisticated and subtle forms of discrimination requires that we analyze the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment, in evaluating a hostile work environment claim."

---

[9] Plaintiff's EEOC charge only references Eileen in relation to the alleged hostile work environment. (Blunda Cert. Ex. C.) Therefore, Plaintiff's claim, as relates to Title VII, will be limited in scope to Eileen's conduct. *See also Canete v. Barnabas Health Sys.*, No. 12-7222, 2013 WL 5305236, at *4 (D.N.J. Sept. 18, 2013) (explaining that civil actions brought under Title VII must be "reasonably within the scope of the charge filed with the EEOC"). Plaintiff may not expand the scope of her charge based on references to other individuals in her EEOC Intake Questionnaire. *Id.* (finding a similar argument to be without merit); *Barzanty*, 361 F. App'x at 415 ("A plaintiff cannot be allowed to transfer the allegations mentioned only in the questionnaire to the charge itself.").

*Cardenas v. Massey*, 269 F.3d 251, 261-62 (3d Cir. 2001). Second, Plaintiff has raised genuine issues of material fact that would permit a reasonable jury to infer that Eileen's behavior was racially motivated. She has proffered the affidavit of a former employee at JCMC who avers that "Eileen openly bullied and challenged the authority of black woman [sic] who were equal or superior to her in position at JCMC." (Whyatt Aff. ¶¶ 15-16.) Additionally, Cataudella testified that she planned to terminate Eileen, at least in part due to Plaintiff's allegations that Eileen was harassing her based on her race. (Cataudella Dep. 48:12-19, 64:17-65:22.)

Defendants also argue that the alleged discriminatory conduct was neither severe nor pervasive enough to support a hostile work environment claim. (Defs.' Moving Br. at 34.) However, when determining whether an environment is hostile, it is improper to "parse[] out each event and view[] them separately, rather than as a whole." *Mandel*, 706 F.3d at 168. Instead, "a court must consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id*. Based on the number of grievances Plaintiff filed within a three-month period, a trier of fact could reasonably find that Plaintiff suffered persistent racial discrimination in her workplace, and that at a minimum it interrupted her ability to perform her job duties. Although "JCMC exhaustively investigated Plaintiff's claim . . . and terminated Eileen . . . based upon its investigation[,]" (Defs.' Moving Br. at 37), there are still questions of fact as to whether Defendants promptly remedied the overall situation. *See, e.g.*, *Brown*, 2016 WL 3951378, at *6 (denying a summary judgment of discrimination, hostile work environment, and retaliation claims "[b]ecause genuine issues of material facts remain as to witness credibility and the impetus behind [the defendant-employer's] (and its employee's) actions"). As such, Defendants' motion for summary judgment is denied as to Count Three.

E. Aiding & Abetting NJLAD Violations (Count Four)

The NJLAD prohibits "any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under [the] act[.]" N.J. Stat. Ann. § 10:5–12(e). To hold a defendant liable for aiding and abetting discrimination in violation of the NJLAD, the plaintiff must show:

> (1) the employer whom the defendant aided performed a wrongful act causing injury; (2) the defendant was generally aware of his role as part of an overall illegal or tortious activity at the time that he provided the assistance; and (3) the defendant knowingly and substantially assisted the principal violation.

*Hicks v. N.J. Dep't of Corr.*, No. 16-0927, 2017 WL 4858122, at *4 (D.N.J. Oct. 27, 2017) (citation omitted); *see also Cicchetti v. Morris Cty. Sheriff's Office*, 947 A.2d 626, 645 (N.J. 2008). Aiding and abetting requires "active and purposeful conduct." *Cicchetti*, 947 A.2d at 645. "Substantial assistance will depend on the nature of the act encouraged, the amount of assistance given by the defendant, [her] presence or absence at the time of the tort, [her] relation to the harasser, [her] state of mind, and the duration of the assistance provided." *Newsome v. Admin. Office of Courts of State of N.J.*, 103 F. Supp. 2d 807, 823 (D.N.J. 2000) (citations omitted); *see also Rowan v. Hartford Plaza Ltd.*, No. A-0107-11T3, 2013 WL 1350095, at *7 (N.J. Super. Ct. App. Div. Apr. 5, 2013).

Here, assuming *arguendo* that Plaintiff can establish that her employer violated the NJLAD, she has failed to present evidence that Dr. Grigoriu substantially assisted in any discriminatory or retaliatory conduct. *See Failla v. City of Passaic*, 146 F.3d 149, 159 (3d Cir. 1998) ("Employees are not liable as aider and abettor merely because they had some role, or knowledge or involvement."). Therefore, Defendants' motion for summary judgment is granted as to Count Four.

### IV. CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment is **GRANTED in part and DENIED in part**. An appropriate Order follows.

s/ *Susan D. Wigenton*_____
**SUSAN D. WIGENTON**
**UNITED STATES DISTRICT JUDGE**

Orig: Clerk
cc: Hon. Leda D. Wettre U.S.M.J.
Parties